IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAMON PETERSON, | ) | CASE NO. 1:16 CV 509 |
| | ) | |
| Petitioner, | ) | |
| | ) | CHIEF JUDGE PATRICIA A. GAUGHAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MICHELLE MILLER, Warden, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |

## INTRODUCTION

Petitioner Damon Peterson, a prisoner in state custody, has filed in this Court a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentences in *State v. Peterson*, Case Nos. CR-13-571165-E and CR-13-571726-C. (Doc. No. 1.) Respondent Warden Michelle Miller[1] has filed a return of writ. (Doc. No. 13.) Peterson has filed a traverse. (Doc. No. 14.)

This matter is before the undersigned by an automatic order of reference under Local Rule 72.2 for preparation of a report and recommendation on Peterson's petition or other case-dispositive motions.[2] For the reasons stated below, the Court recommends Peterson's petition be DISMISSED.

---

[1] Michelle Miller is the warden of the Belmont Correctional Institution, where Peterson is incarcerated. (Doc. No. 13 at 1.)

[2] This case was transferred to the undersigned from Magistrate Judge Nancy A. Vecchiarelli upon her retirement.

Ohio's Eighth District Court of Appeals set forth the following facts underlying

Peterson's convictions:

## A. Gas USA

{¶ 12} Mohammed Widdi, a manager of the Gas USA on St. Clair Avenue, testified that he was working at the gas station with a clerk, Anisha Gibson, at approximately 7:00 p.m. on September 21, 2012. At that time, a male approached the counter of the store with a can of beer and asked for a lottery ticket. The male handed Widdi a $20 bill, and as Widdi was making change, the male pointed a gun at his face and said, "Give me the money or I'll kill you." Widdi testified that the male then jumped on the counter and "grabbed the money out of the lottery and walked across the counter." He stated that the male then went to the second register, while walking on the counter, where Gibson opened the register for him. Gibson testified that the male pointed the gun at her, and he removed the money from Gibson's register.

{¶ 13} Widdi testified that there was another male standing in the store in front of Gibson. This individual left with the male with the gun. Widdi testified that the male with the gun was walking "nonchalant, nice and slow" and when he reached the door, both individuals ran. One individual ran to the left of the store, towards East 124th Street, and the other individual ran right, towards East 123rd Street. Widdi believed the two individuals were together. At the time of the robbery, only four of the eight installed video surveillance cameras were working. Widdi made a copy of the surveillance video for the police.

{¶ 14} Detective John Riedthaler processed the crime scene. He removed two latent fingerprints from the beer can left on the counter and submitted the prints to the city of Cleveland's fingerprint examiners. The examiners matched the fingerprints to Darrell Coleman.

{¶ 15} Codefendant Darrell Coleman, a.k.a. "Bama," testified against Peterson as a condition of his plea agreement with the state regarding the incidents with which he was involved. Coleman stated that he was not told what to say and that he was instructed to testify "truthfully." He testified that he, codefendant Steven Mongo, and Peterson have committed robberies together and they were involved with the robbery of the Gas USA. Coleman stated that the three of them were just riding around and "just picked that specific spot" to rob in a "spur of the moment."

{¶ 16} According to Coleman, Peterson parked his gold SUV (sport utility vehicle) on a side street. The plan was for Peterson to be the getaway driver and Coleman and Mongo would "scope the place out" in order to see how many people were working, "what's going on, see whose [sic] in there." On the evening of September 21, after Peterson parked his car, Coleman and Mongo entered the Gas USA, pretending to be shopping. Coleman approached the cash register, pulled his gun on the male employee at the counter, and instructed both the male and female employees to empty the cash registers. Coleman testified that after receiving the money, they fled the gas station and ran back to Peterson's SUV. Coleman stated that the money from the robbery was split equally among them and amounted to "[o]ver a thousand. Something like $1,500, something like that." He admitted, however, that he kept extra cash for himself, stating, "I cuffed a little."

{¶ 17} Steven Mongo also testified against Peterson as a condition of his plea agreement. He testified that he, Coleman, and Peterson drove together in Peterson's SUV to the Gas USA. They discussed robbing the place "if it was sweet." According to Mongo, he entered the store first, in order to survey it, and he is followed by Coleman. He was at the counter when Coleman jumped on the top of the counter and robbed the place. Mongo testified that Coleman left the store first and Mongo followed. He stated that when he returned to the side street where Peterson had parked, he discovered that Peterson had fled in his vehicle. He continued to walk to the next street where Peterson eventually pulled up and picked Mongo up. Mongo testified that he was angry and told Peterson that he thought he left him. Mongo also testified that each of them received approximately $200.

**B. Ya–Ya Market**

{¶ 18} Ayed Kanaan, owner of the Ya Ya Market on East 99th Street and Union Avenue, testified that he was working at the convenience store the evening of September 25, 2012, when three males came into his store around 9:00 p.m. The first male, Keith Perry, was a regular customer. He purchased some items and left the store. Of the two males remaining in the store, Kanaan described the one male as "younger, * * * round face, nubby hair, short, cocky." He recognized the other male from visiting the store earlier that day. He was taller, with lighter skin, and had "something around his eyes."

{¶ 19} Kanaan testified that the shorter male, later identified as codefendant Steven Mongo, came to the counter and asked for a cigarillo. He gave Kanaan a $20 bill and, after paying for the item, asked for change. As Kanaan was counting the change, the taller male pulled a gun on Kanaan and tried to jump on the counter. Kanaan stated that he was carrying a handgun because he was robbed a week earlier and he was nervous. Kanaan testified that the taller male fired a shot at him and Kanaan returned fire. At that time, the taller male fell back and then ran toward the exit. The shorter

male, however, was unable to leave the store as Kanaan held his gun on him, instructing him not to move. Kanaan testified that moments later, the taller male opened the door to the store with his left arm and began to fire while yelling, "Get out!" Kanaan stated that he was addressing the shorter male who purchased the cigarillo. Kanaan fired back.

{¶ 20} When the gun fire ceased, Kanaan noticed the victim, Duane Jacobs, a man who had worked at the store that evening, "twist and [fall]" near the front door. Kanaan called 911. Thereafter, Delilah Turner, who often helped Kanaan at the store, ran into the store to help. Because he had been robbed the week before, Kanaan had a video surveillance system installed. He turned over his copy of the video that had been taken that evening to the police.

{¶ 21} Delilah Turner lived in the upstairs apartment behind the Ya Ya Market, and she frequently helped Kanaan at the store. Turner testified that she was at the store between 8:30 p.m. and 8:45 p.m. on September 25 and returned home shortly thereafter. While in her residence, she heard shots fired. When the gunfire ceased, she went to her back door and saw two males running down the street toward what looked like a silver vehicle under the streetlight. Turner testified that she saw a larger male wearing a dark hoodie and blue jeans and a thinner male wearing lighter clothing get into the vehicle. The thinner male got into the passenger side of the vehicle. The larger male was almost left behind because the vehicle began to drive away. She stated that the male threw his hands up, the vehicle stopped, and the male jumped into the rear of the vehicle, behind the driver. The video surveillance revealed the males approaching the vehicle at 8:59 p.m.

{¶ 22} Turner testified that she could only see the back of the vehicle and told police that, at the time, the vehicle looked like a silver Town and Country van. She stated that she never saw the front or sides of the vehicle, but she remembered the rear window of the vehicle. At trial, Turner identified the vehicle depicted in the state's exhibit No. 142 (a gold SUV) as the vehicle she saw the two males get into that evening, recognizing the rear profile of the vehicle she saw on the evening of September 25, 2012. She acknowledged that it was not a minivan.

{¶ 23} Keith Perry, who lived on Union Avenue near the Ya Ya Market and often helped Kanaan at the store, went to the store on the evening of September 25, 2012. He testified that, as he was leaving the store, two males entered. He overheard one of the males say, "Man, hurry up, come on, come on!" Thereafter, he heard gunfire and he ran for safety. As he was running, Perry testified that he saw two males coming out of the store "a little chubby one" and "kind of a slim one." He testified that he saw the males running up the street to what appeared to be a silver vehicle. Perry then heard the vehicle screeching away. He stated that he did not get a good look at the vehicle because he was running away. Perry returned home and told his

fiancée to call the police. He went back to the store because he "knew the people in the store," and he reported what he saw to the police.

{¶ 24} Kenneth Walker, who lived on East 98th Street, near the Ya Ya Market, testified that on the evening of September 25, 2012, he was in the store speaking with Jacobs and Kanaan approximately ten minutes before Jacobs was shot. He left the store to go home, which is the high-rise apartment across the street, only to return because he forgot something. Walker testified that as he was walking back toward the store, he saw two males run past him, one was "a little chubby" and the other was "a little taller than me * * * kind of a slim one." He stated at trial that he saw the males run down East 99th Street, away from Union Avenue, to a vehicle that looked like "a minivan or an SUV, or something." He told police that evening, however, that the vehicle appeared to be a silver minivan. He reported that he only saw the back of the vehicle.

{¶ 25} Darrell Coleman testified that on September 25, 2012, he, Mongo, and Peterson decided to rob the Ya Ya Market, just four days after robbing the Gas USA, stating, "we was being greedy." He testified that Peterson drove his "champagne gold color SUV" to the store. Peterson parked the SUV approximately six houses down from the Ya Ya Market on East 99th Street. Coleman, Mongo, Peterson discussed what job everyone had for the robbery. Coleman testified that Peterson was supposed to wait in the car and be the driver.

{¶ 26} Coleman and Mongo went inside the store, and Coleman waited until Mongo reached the cash register. Mongo was acting like he was buying cigarettes. Coleman stated that he jumped on the counter and pulled a gun on the clerk. He testified that he used the same .22 caliber automatic weapon from the Gas USA robbery. He fired the first shot, and then the clerk fired back. At that point, Coleman stated that he got off the counter and started running, as the clerk was firing at him. Coleman testified that he made it out of the store, but he came back for Mongo. While Coleman and the clerk exchanged gunfire, Coleman waved for Mongo to get out of the store. Coleman testified that they ran back to Peterson's vehicle, where Peterson was waiting for them. Coleman entered the passenger side of the car, and Mongo entered the driver's side, and they left the scene.

{¶ 27} Steven Mongo testified that on September 25, 2012, while sitting in Peterson's vehicle, he, Coleman, and Peterson discussed how they would rob the Ya Ya Market. Mongo stated that the vehicle in which they rode to the Ya Ya Market was the same vehicle used in the robbery of the Gas USA. Mongo and Coleman exited the vehicle and entered the store. Mongo stated that he went to the counter to buy something, as a distraction, and Coleman robbed the store. He also stated that Coleman fired a shot with the same gun used in the Gas USA robbery, and the clerk returned fire. Coleman left the store and eventually came back to get Mongo, who was being held at gunpoint by the clerk.

{¶ 28} Mongo testified that he and Coleman went to East 99th Street where they "jumped back in Dame['s] vehicle." Coleman got into the passenger side. Mongo stated that Peterson was beginning to drive away, but Mongo arrived in time and entered the back seat. Mongo identified Peterson's vehicle, an Explorer, from the video surveillance taken the evening of September 25, 2012. Mongo testified that later in the evening he saw news reports of the robbery.

{¶ 29} Officer Mark Peysha of the Cleveland Police Department responded to the scene. Officer Peysha observed Duane Jacobs unresponsive and lying inside the doorway of the Ya Ya Market with a large amount of blood around him. He called for an ambulance, which arrived almost immediately. He interviewed witnesses and took descriptions of the individuals who had robbed the store.

{¶ 30} Dr. Joseph Felo, forensic pathologist, performed an autopsy on Duane Jacobs. He discovered eight injuries to the body. Dr. Felo determined that the cause of death was "gunshot wound of the head with skull and brain injuries."

{¶ 31} Detective James Raynard, a crime technician for the Cleveland Police homicide unit, was called to the Ya Ya Market at 10:20 p.m. on September 25, 2012. He processed the scene and took photographs. Detective Raynard recovered a fired casing on the floor of the store as well as a spent bullet by the doorway.

{¶ 32} Detective Kathleen Carlin of the Cleveland Police homicide unit, along with her partner, Detective Timothy Entenok, investigated the death of Duane Jacobs at the Ya Ya Market and assisted with the collection of evidence at the scene. Detective Carlin spoke with Kanaan and nearby residents, who gave descriptions of the perpetrators. The detectives enlisted the assistance of an audiovisual expert with the police department to make still photographs from the video surveillance cameras. The stills depicted the two perpetrators and the vehicle on the scene.

{¶ 33} According to Detective Carlin, FBI agent Andy Burke contacted her regarding Coleman and Mongo. Burke had arrested Mongo and transported him to the police station to be interviewed, where Mongo gave a statement that implicated Peterson, himself, and Coleman in the robbery and murder at the Ya Ya Market. Mongo was charged with aggravated murder. That same day, the Cleveland Police Department arrested Coleman.

{¶ 34} On November 28, 2012, Detective Carlin learned about a potential witness, Brittany Fredericy. The detectives interviewed Fredericy on two occasions. Based upon the information obtained from Fredericy, the police department issued an arrest warrant for Peterson. Peterson was arrested on January 15, 2013, and he denied knowing Coleman, Mongo, Lane, and TJ.

{¶ 35} Detective Carlin testified that, upon reviewing the video surveillance from the evening of September 25, 2012, she observed video of a Ford Explorer traveling westbound on Union Avenue "minutes before the robbery," and it turned northbound on East 99th Street. She further testified that the vehicle "never came back into camera view after driving down East 99th Street." Detective Carlin stated that immediately before the robbery, the only vehicle that drove down East 99th Street was the Ford Explorer. There was no video of a silver minivan.

{¶ 36} Brittany Fredericy, who had two children with Darrell Coleman, testified that she lived with Coleman. She stated that Coleman "committed crimes" to support his family. Fredericy knew Peterson, Mongo, Demario J. Lane, and TJ, and she has seen Coleman, Mongo, and Peterson with a gun. She stated that all of the men would mostly spend time at the home she shared with Coleman, and Peterson would drive there in his Explorer.

{¶ 37} Fredericy testified that she saw a picture of Coleman and Mongo on the news, indicating they were wanted by the police. She witnessed Mongo's arrest across the street from her house on November 15. After the arrest, the officers came to her door, where she denied knowing Coleman. Fredericy testified that, thereafter, she phoned Coleman and told him that the police had searched the house and were looking for him. Fredericy was later arrested for tampering with evidence. She identified Coleman and Mongo in the Ya Ya Market videos and told the police about other robberies they had committed.

{¶ 38} Amanda Tidd, who had two children with Demario Lane and lived with Lane, testified that she knew Coleman, Mongo, and Peterson. She stated that she saw Peterson drive his Explorer approximately two times per week.

## C. Union Beverage

{¶ 39} Rami Chalhoub, a manager at Union Beverage, a state liquor agency located on Union Avenue, testified that he was working at the store on the evening of October 19, 2012, when he heard "a burst of [gun]shots, three to four shots" from outside the store, then another two or three shots. He then saw a man, later identified as victim, Sean Stewart, walk in and fall to the floor. Chalhoub recognized the man as a regular customer who had been in the store just 10 to 15 seconds before the gunshots. The store's video surveillance captured the moments in the store before and after the gunshots, and the videos were turned over to the police. Chalhoub stated that not all of the cameras were operable at the time of the shooting. After the victim limped into the store, Chalhoub closed the shutters and called 911. Chalhoub stated that it was a very busy night and people were screaming as they surrounded the victim, attempting to help him by pouring water on him. An ambulance arrived shortly thereafter.

{¶ 40} Michael Frizzell, who was waiting for a friend in a parked car in the parking lot of Union Beverage on the evening of October 19, 2012, testified that he saw the victim, whom he recognized as a friend's brother, come out of the store. He stated that he then heard about seven or eight gunshots, and jumped into the back seat of the car with his friend's children. Frizzell saw the victim fall to the ground, get up, and run back into the liquor store. He stated that he then saw a group of people run away together, including two to three people with guns.

{¶ 41} Darrell Coleman testified that on the evening of October 19, 2012, he, Mongo, Lane, TJ, and Peterson walked to Union Beverage because Peterson's car was broken down at the time. He testified that the five of them were planning to rob someone. Coleman testified that while inside the store, Peterson told him that he found someone to rob, telling Coleman that he had "a lick."

{¶ 42} Coleman then saw Peterson and Mongo outside, near the dollar store, and he saw the victim walk out of the liquor store toward the dollar store. Coleman walked out of the store, following the victim. Coleman testified that as the victim was walking toward Peterson and Mongo, Peterson pulled his gun out, the victim hit the gun, and then Peterson shot the victim four or five times. Coleman stated that he was trying to get out of the way of the gunfire and he ran toward the victim as the victim was running back to the liquor store, and Coleman pulled his gun out. Coleman heard Peterson tell Mongo to check the victim's pockets, but the victim made it to the store and "from there we all ran." They all returned to the "girl's" house where they met before going to Union Beverage that evening. Coleman testified that Peterson's gun was a .45 caliber Glock.

{¶ 43} Steven Mongo testified that on the evening of October 19, 2012, he was "kicking it" with Bama, Demario Lane, TJ, Peterson, and a group of girls at TJ's cousin, Marisha Jackson's ("Isha"), house for a couple of hours. At some point in the evening, approximately 8:00 p.m., the five men walked to the liquor store. After walking around inside the store for several minutes, they decided to leave. Mongo testified that when he exited the store, he saw that Peterson had a gun pointed at the victim. Peterson told Mongo to "hit his pockets," or go in his pockets, and Mongo "freezes up," and the victim "took off running." Mongo stated that "in a couple of seconds," shots were fired as the victim attempted to run back into the liquor store. Mongo testified that he, Dame, and Coleman returned to Isha's house, where they argued about Mongo's failure to "go in" the victim's pockets. Mongo testified that a couple of days later, at Rio's house, Mongo and Peterson argued again about Mongo's role at Union Beverage and that Peterson blamed Mongo for "fuck[ing] up." He stated that Lane and Coleman were present during this argument.

{¶ 44} At trial, Mongo identified Coleman, Lane, TJ, Peterson, and himself in the videos taken at Union Beverage.

{¶ 45} Codefendant Demario Lane testified against Peterson as a condition of his plea agreement. Lane stated that he knew Peterson, Mongo, TJ, and Coleman. They often hung out together, and they "rob[bed] people." Lane stated that the group often hung out at Coleman's place. He testified that Peterson was the only member of the group who had a vehicle, which was a gold Explorer.

{¶ 46} Lane testified that on October 19, 2012, the five of them walked to Union Beverage from Isha's house. They did not drive Peterson's truck because it was not working at the time. Lane stated that when they arrived at the store, Coleman purchased a bottle of liquor while Lane attempted to purchase a cell phone. Peterson left the store with Coleman, Mongo, and TJ, while Lane remained in the store, at the phone section. Lane then heard five to seven gunshots while waiting at the phone section. He saw the victim run into the store, saying, "I'm shot! I'm shot!" Lane saw the victim covered in blood. At trial, Lane identified Peterson, Mongo, Coleman, TJ, and himself on the Union Beverage video. Lane testified that a couple of days after the shooting, when Peterson and Mongo were at Lane's home, he heard Peterson yell at Mongo because Mongo "froze up on him again."

{¶ 47} Codefendant TJ testified against Peterson, whom TJ said is one of his best friends. TJ stated that he was prepared to testify truthfully and no one told him what to say. He testified that Peterson used a "beige" Explorer to get around. He also testified that he robbed an individual and obtained a black .45 caliber handgun from the robbery. From that time forward, Peterson possessed the handgun.

{¶ 48} TJ testified that on October 19, 2012, he, Coleman, Peterson, Mongo, and Lane went to TJ's cousin, Isha Jackson's, house at approximately 8:00 p.m. There were other girls there. The group of men decided to walk to Union Beverage. While in the store, TJ received a call from his cousin, Gilbert Foster, who wanted to purchase the .45 caliber handgun from Peterson. TJ gave his phone to Peterson to talk to Foster.

{¶ 49} TJ testified that Coleman, Mongo, and Peterson walked out of the store together, Peterson passed TJ's phone back to Coleman, and Coleman came back into the store to return TJ's phone. TJ stated that he then left the store to continue a phone conversation with his wife and saw Peterson pull out the .45 caliber handgun and point it toward the victim. TJ saw the victim push Peterson and try to smack the gun down. TJ testified that Peterson then shot the victim two or three times, the victim began to run, and Peterson fired "a couple more shots." The victim eventually made it back to the store.

{¶ 50} When the group returned to Isha's house, TJ confronted Peterson about the shooting "in front of everybody," to which Peterson replied that "the dude had about $5,000 in his pocket. I got kids." TJ told Peterson that Peterson almost shot him, and

Peterson replied that he saw him and wasn't going to shoot him. TJ stated that he was upset with Peterson for firing shots in his direction.

{¶ 51} Coleman, Peterson, and Mongo got a ride from Peterson's mother, and TJ then walked home, where he told his wife what had happened. After learning from his uncle that the police were looking for him, TJ turned himself in on January 16, 2013.

{¶ 52} Officer Rebecca Werner responded to Union Beverage on the evening of October 19, 2012, to shots being fired. She and her partner attempted to speak with the victim, who was covered in blood, to no avail. They called for an ambulance, managed the large crowd surrounding the victim, interviewed witnesses, and secured the scene. Officer Werner testified that, in speaking with approximately nine witnesses inside the store, they learned "vague suspect information" of "five black males wearing all black with handguns."

{¶ 53} Detective Darryl Johnson of the Cleveland Police Department, responded to the scene, taking pictures, and noting evidence, including spent casings. He assisted with collecting $408.50 from the victim's clothing. Detective Johnson stated that the money was extremely wet and saturated with blood. Detective David Borden, also of the Cleveland Police Department, submitted to the lab for examination three spent bullets and four spent .45 caliber cartridges found at the scene. Firearms examiner Kristen Koeth determined that the four cartridges were fired from the same .45 caliber Glock handgun.

{¶ 54} Dr. Dan Galita, a forensic pathologist, conducted the autopsy of Sean Stewart. He noted that Stewart suffered three gunshot wounds in the lower abdomen and right upper thigh. Dr. Galita determined that the cause of death was the gunshot wounds. Ballistics confirmed that a .45 caliber handgun, a Glock, was used on the victim.

{¶ 55} Isha, TJ's cousin, who lives five minutes from Union Beverage, testified that Peterson, Mongo, Coleman, TJ, and Lane were at her house the night the liquor store closed on October 19, 2012. TJ was going to purchase a bottle of liquor for Isha and other guests. Isha testified that when the group of men returned from the liquor store, approximately 30 minutes later, they were "kind of hyped and just wasn't normal." They asked if they could spend the night, but Isha told them they had to leave. Shortly after the men left, TJ arrived and sat on her porch. Isha testified that TJ, who was on the phone, appeared to be drunk and breathing heavily, and he seemed "hostile." He did not speak with her, nor did he come inside the house.

{¶ 56} Isha identified Peterson's truck in the state's exhibit No. 766 (the gold Explorer) and further testified that she has seen Peterson drive the "gray" or "tan" truck on numerous occasions, during the "week, at night, weekends." She has never

seen him drive any other vehicle. Finally, Isha stated that she had seen each of the men in Peterson's vehicle at one time or another.

{¶ 57} Brittany Fredericy identified Peterson, Mongo, Coleman, TJ, and Lane in the Union Beverage video. Amanda Tidd testified that she overheard a conversation between Peterson and Mongo, during which Peterson told Mongo that he "fucked up" at the liquor store.

{¶ 58} Jamese Johnson, TJ's wife, testified that on October 19, 2012, TJ called her to pick him up at his cousin's house. Jamese stated that TJ "sounded worried and scared" on the phone. When she picked him up in front of Isha's house, he appeared "scared, nervous, and shocked, like he was really worried." Jamese stated that later in the evening, TJ told her and his mother about the events that occurred at Union Beverage. Both Jamese and TJ's mother contacted the police.

{¶ 59} Jamese further testified that Peterson came to their home sometime "after Mongo went to jail." She stated that Peterson's girlfriend owned a "champagne" Explorer and Peterson drove an Explorer. Peterson was looking for TJ, who was not home at the time. Jamese stated that Peterson asked her if TJ was mad at him because he almost shot TJ. Jamese identified Peterson, Mongo, Coleman, Lane, and TJ in the Union Beverage video.

{¶ 60} Terlon Turpin, Peterson's fiancée, testified that she purchased a 1999 gold Ford Explorer in December 2011. Title Loan repossessed the vehicle "sometime before Halloween," October 31, 2012. She stated that she drove the Explorer in August and September 2012. Barbara Bradford, Turpin's employer, testified that Turpin worked part time, 6 to 25 hours per week, at her day care center and that Turpin used to drive a gold Explorer.

{¶ 61} Damon Peterson testified on his own behalf and denied involvement in any crime.

*State v. Peterson*, Nos. 100897/100899, 2015 WL 1249680, at *3-11 (Ohio Ct. App. March 19, 2015).

These facts "shall be presumed to be correct," and Peterson has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 360-61 (6th Cir. 1998).

**PROCEDURAL BACKGROUND**

**A.      Trial Court**

On January 30, 2013, in Case No. CR-13-571165-E, the Cuyahoga County Grand Jury indicted Peterson, along with co-defendants Demario Lane, Darrell Coleman, Steven Mongo, and Torrance Johnson, on thirty-nine  counts relating to the events at the Ya-Ya Market on September 25, 2012, and the Union Beverage on October 19, 2012.  (Doc. No. 13-1, Exh. 1.) The charges against Peterson consisted of:  (1) four counts of aggravated murder in violation of Ohio Rev. Code § 2903.01(A) and Ohio Rev. Code § 2903.02(B); (2) six counts of murder in violation of Ohio Rev. Code § 2903.02(A), (B); (3) one count of attempted murder in violation of Ohio Rev. Code §§ 2923.02, 2903.02(A); (4) four counts of aggravated robbery in violation of Ohio Rev. Code §§ 2911.01(A)(1), (A)(3); (5) one count of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(2); and (6) four counts of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(1), (A)(2).  (Doc. No. 13-1, Exh. 1.)  The charges also included one- and three-year firearm specifications.  (Doc. No. 13-1, Exh. 1.)

On March 5, 2013, in Case No. CR-13-571726-C, the Cuyahoga County Grand Jury indicted Peterson, along with co-defendants Coleman and Mongo, on eight counts stemming from the events at Gas USA on September 21, 2012.  (Doc. No. 13-1, Exh. 2.)  The charges against Peterson included:  (1) two counts of aggravated robbery in violation of Ohio Rev. Code § 2911.01(A)(1); (2) two counts of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(2); (3) one count of theft in violation of Ohio Rev. Code § 2913.02(A)(1); and (4) one count of having weapons while under disability in violation of Ohio Rev. Code § 2923.13(A)(3).  (Doc.

12

No. 13-1, Exh. 2.)  The charges also included one- and three-year firearm specifications.  (Doc. No. 13-1, Exh. 2.)

Peterson entered pleas of not guilty to all charges.  (Doc. No. 13-1, Exhs. 3, 4.)

The cases were tried jointly before a jury starting on December 4, 2013.  (Doc. No. 13-1, Exh. 5.)  On December 17, 2013, the jury issued its verdicts.  (Doc. No. 13-1, Exhs. 5, 6.)  In Case No. CR-13-571165-E, the jury found Peterson guilty of two counts of aggravated murder, four counts of murder, three counts of aggravated robbery, one count of kidnapping, and three counts of felonious assault, along with the attendant one- and three-year firearm specifications; and not guilty of the remaining charges.  (Doc. No. 13-1, Exh. 5.)  In Case No. CR-13-571726-C, it found Peterson guilty of all charges and attached specifications.  (Doc. No. 13-1, Exh. 6.)

On December 19, 2013, the court conducted a sentencing hearing and imposed an aggregate sentence of life in prison without the possibility of parole.  (Doc. No. 13-1, Exhs. 7, 8.)  *See also Peterson*, 2015 WL 1249680, at *2 (listing sentences for each offense).

## B.    Direct Appeal

Peterson, through counsel, filed timely notices of appeal to the Eighth District Court of Appeals in both cases.  (Doc. No. 13-1, Exhs. 9, 10.)  On February 23, 2014, Peterson filed a motion to consolidate the two appeals, which was granted.  (Doc. No. 13-1, Exhs. 11, 12.)  In his appellate brief, he raised the following assignments of error:

1.    The trial court erred by granting the State's motion to join the indictments in one trial which resulted in prejudice to Appellant and violated his federal constitutional rights because the joint trial was fundamentally unfair.

2.    Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motions for acquittal in each case.

3. The convictions were against the manifest weight of the evidence.

4. The improper comments made by the State amounted to plain error in violation of Appellant's right to due process and a fair trial and/or counsel's failure to object to them denied Appellant his constitutional right to effective assistance of counsel.

5. The trial court erred by prohibiting Appellant from consulting with his attorney during the trial while allowing another witness to consult with his counsel in the middle of that witness's testimony and by overruling objections to questioning not based on evidence.

6. The trial court improperly limited Appellant's cross-examination of a witness and by allowing the State to conduct recross[-]examination of Appellant that was beyond the scope of re-direct.

7. The trial court erred by overruling Appellant's objections to improper comments made by the State concerning Appellant's invocation of his federal and state constitutional rights to remain silent and to request counsel.

8. The trial court erred by overruling Appellant's objections to improper questioning by the State.

9. Appellant was deprived of his constitutional rights to a fair trial and due process and the effective assistance of counsel and plain error occurred when other acts and irrelevant prejudicial evidence was admitted during trial in violation of Evid. R. 401, 402, 403, and 404(B) and there was no objection to its admission.

10. The trial court erred by imposing consecutive sentences, by failing to merge all allied offenses of similar import, and by imposing a fine.

(Doc. No. 13-1, Exh. 13 (capitalization altered).) The State filed a brief in response. (Doc. No. 13-1, Exh. 14.)

On March 19, 2015, the Ohio appellate court affirmed the trial court's judgment. (Doc. No. 13-1, Exh. 15.)

Peterson, acting *pro se*, filed a timely appeal of the appellate court's judgment to the Ohio Supreme Court. (Doc. No. 13-1, Exh. 16.) In his memorandum in support of jurisdiction, he set forth the following propositions of law:

1. Fair Trial; Due Process; Equal Protection by law are denied the appellant as the appellant [was] sentence[d] without [any] facts of law to determine the guilt and without fair trial the evidence is non[-]existen[t] for review.

2. [There was insufficient evidence to support appellant's convictions.]

(Doc. No. 13-1, Exh. 17.)

The Ohio Supreme Court declined jurisdiction over the appeal on July 22, 2015. (Doc. No. 13-1, Exh. 18.)[3]

## FEDERAL HABEAS CORPUS

Peterson, acting *pro se*, filed the petition for writ of habeas corpus now before this Court on March 3, 2016. (Doc. No. 1.) The petition asserts the following grounds for relief:

1. The trial court erred by granting the state's motion to join the indictments in one trial which resulted in prejudice to appellant and violated his federal constitutional rights because the joint trial was fundamentally unfair.

2. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motions for acquittal in each case.

3. The convictions were against the manifest weight of the evidence.

4. The improper comments made by the state amounted to plain error in violation of appellant's right to due process and a fair trial and/or counsel's failure to object to them denied appellant his constitutional right to effective assistance of counsel.

---

[3] Peterson states in his petition that he filed an application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B) in the Ohio Supreme Court. (Doc. No. 1 at 4.) There is no record of that filing in the dockets of either the Ohio Supreme Court or the Eighth District Court of Appeals, where the appellate rules require such an application to be filed.

5.      The trial court erred by prohibiting appellant from consulting with his attorney during the trial while allowing another witness to consult with his counsel in the middle of that witness's testimony and by overruling objections to questioning not based on evidence.

6.      The trial court improperly limited Petitioner's [c]ross-examination of a witness and by allowing the State to conduct recross-examination of Petitioner that was beyond the scope of re-direct.

7.      The trial court erred by overruling appellant's objections to improper comments made by the state concerning appellant's invocation of his federal and state constitutional rights to remain silent and to request counsel.

8.      The trial court erred by overruling appellant's objections to improper questioning by the state.

9.      Appellant was deprived of his constitutional rights to a fair trial and due process and the effective assistance of counsel and plain error occurred when other acts and irrelevant prejudicial evidence was admitted during trial in violation of Evid. R. 401, 402, 403, and 404(B) and there was not objection to its admission.

10.     The trial court erred by imposing consecutive sentences, by failing to merge all allied offenses of similar import, and by imposing a fine.

(Doc. No. 1 at 6, 7, 9, 10, 12, 14, 15, 17, 18-19, 20.)

On August 24, 2016, Respondent filed a return of writ.  (Doc. No. 13.)  On September 21, 2016, Peterson filed a traverse.  (Doc. No. 14.)[4]

---

[4] On March 28, 2017, Peterson filed an "Affidavit of Recantation of Statement," signed by Torrance Johnson.  (Doc. No. 15.)  The Court acknowledged receipt of the affidavit, but explained that because Mr. Johnson is not a party to this case and has not filed a motion to intervene or otherwise sought leave to file any documents in this case, the Court would not entertain the affidavit at that time.  The Court noted, however, that it might consider the affidavit if it were presented to the Court in a procedurally appropriate manner.  (Doc. No. 16.)

## A. AEDPA Review

Peterson's petition for writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as it was filed after the Act's 1996 effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)). The Act "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of AEDPA's most significant limitations on district courts' authority to grant writs of habeas corpus is found in § 2254(d). That provision forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 134 S. Ct. at 15 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under de novo review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (internal quotation marks omitted). Thus, a petitioner "must show that the state court's ruling . . .

was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

### B.     Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Procedural default occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456

20

U.S. at 125 n.28; *Williams*, 460 F.3d at 806. In determining procedural default, the federal court again looks to the last explained state-court judgment. *Ylst*, 501 U.S. at 805; *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

Where a state court declines to address a prisoner's federal claims because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

A petitioner also may procedurally default a claim by failing to raise the claim in state court, and pursue the claim through the state's "ordinary appellate review procedures," if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v.*

21

*Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue - not merely as an issue arising under state law.'" *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## C.    Cognizability

To the extent that claims asserted in federal habeas petitions allege state-law violations, they are not cognizable on federal habeas review and should be dismissed on that basis. "It is not

the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Fundamental fairness under the Due Process Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted).

Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

<strong>ANALYSIS</strong>

**A.  Grounds for Relief One and Three through Ten:  *Procedural Default***

Respondent argues that Peterson's first and third through tenth grounds for relief are procedurally defaulted because he did not fairly present them to the Ohio Supreme Court on direct review.  (Doc. No. 6 at 26-30.)  The Court agrees.

As explained above, to exhaust claims in state courts and preserve them for federal habeas review, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  Peterson raised virtually identical claims in the state appellate court as he does here in Grounds One and Three through Ten.  (*See* Doc. No. 13-1, Exh. 13.)  He did not, however, appeal the state court of appeal's judgment denying those claims to the Ohio Supreme Court.  (*See* Doc. No. 13-1, Exh. 17.)

Moreover, because these claims arise out of the record of proceedings in the trial court, Ohio's *res judicata* doctrine now prohibits Peterson from raising the claims in any state post-conviction proceeding.  *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal).  And with no state-court remedies still available to him, Peterson has procedurally defaulted these claims.  *See Gray v.*

*Netherland*, 518 U.S. 152, 161 62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.").

Peterson argues that the default should be excused because he was indigent and ignorant of the law and therefore forced to rely on an "inmate law clerk" in the prison law library. (Doc. No. 14 at 31-36.) As Respondent points out, however, just as there is no right to counsel beyond the first appeal of right, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), there is no constitutional right to the effective assistance of prison law library personnel, inmate or otherwise. (Doc. No. 13 at 29.) The Supreme Court has held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817 (1977). But the *Bounds* decision "did not create an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

Moreover, it is well-established that "[c]ause for procedural default exists where something *external* to the petitioner, something that cannot fairly be attributed to him, . . . impeded his efforts to comply with the State's procedural rule." *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012) (emphasis original) (citations and internal quotations omitted); *Murray v. Carrier*, 447 U.S. 478, 488 (1986). A petitioner's *pro se* status, therefore, ignorance of the law

and procedural requirements for filing court pleadings, and limited time in a prison law library are insufficient to excuse a procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

Peterson also makes no showing of actual innocence such that his default should be excused.

Accordingly, the Court finds Peterson's grounds for relief one and three through ten are procedurally defaulted, and recommends that they be dismissed on that basis.[5]

## B.     Ground for Relief Two: *Sufficiency of the Evidence*

For his second ground for relief, Peterson claims his convictions were not supported by sufficient evidence. (Doc. No. 1 at 27-29.) Respondent argues this claim also is procedurally defaulted because Peterson did not fairly present it to the Ohio Supreme Court on direct appeal. (Doc. No. 6 at 26-30.)

### 1.     Procedural Posture

As with his other habeas claims, Peterson, through counsel, raised a sufficiency claim that is virtually identical to the claim he raises here in the state appellate court on direct appeal,

---

[5] In addition, as Respondent further argues (Doc. No. 13 at 30-55), several of these claims generally are not cognizable on federal habeas review, including: Ground One, challenging the trial court's joinder of the two cases for trial, *see, e.g., United States v. Lane*, 474 U.S. 428, 446 n.8 (1986) ("Improper joinder does not, in itself, violate the Constitution."); Ground Three, regarding the manifest weight of the evidence, *see, e.g., Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983) (Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those convicted without sufficient proof to allow a finding of guilty beyond a reasonable doubt); Grounds Eight and Nine, challenging the trial court's evidentiary rulings, *see, e.g., Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) ("alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review"); and Ground Ten, relating to sentencing, *see, e.g., Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000) (challenges to a state court's interpretation and application of state sentencing laws generally are not cognizable in federal habeas corpus).

presenting it as a federal constitutional issue.  (*See* Doc. No. 13-1, Exh. 13 at 100-01.)  It is not

clear, however, whether he raised a sufficiency claim in his appeal of the state appellate court's

judgment to the Ohio Supreme Court.  There, Peterson, now acting *pro se*, presented only two

propositions of law.  (*See* Doc. No. 13-1, Exh. 17 at 237-44.)  And he did not clearly identify the

nature of the claims asserted either in his statements of, or arguments supporting, those

propositions.  Liberally construed, however,[6] the Court finds both propositions appear to

challenge the sufficiency of the evidence supporting his arrest and convictions.  (*See, e.g.,* Doc.

No. 13-1, Exh. 17 at 242 ("Due Process is evident: (1) No known evidence is produce [*sic*] to

support the allegation for arrest. (2) During the trial to support the cause of death by the

witnesses [*sic*] statement."); 245 ("In all testimonies by the experts of the Cleveland Police

Department no officers has to date offered physical evidence to link the appellant to a crime.").)

But even assuming Peterson raised a sufficiency claim to the Ohio Supreme Court, it is

unclear if he fairly presented it as a federal constitutional claim.  As explained above, "[f]or a

claim to be reviewable at the federal level, each claim must be fairly presented at every stage of

the state appellate process."  *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009).  A petitioner

fairly presents the substance of his federal constitutional claim to the state courts by:  (1) relying

upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal

constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms

_____

[6] Pleadings of *pro se* litigants are liberally construed.  *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam) (stating *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers"); *see also Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) ("The allegations of a pro se habeas petition, though vague and conclusory, are entitled to a liberal construction," and "[t]he appropriate liberal construction requires active interpretation in some cases to construe a pro se petition to encompass any allegation stating federal relief" (internal quotation marks and citations omitted)).

sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). "A petitioner need not cite 'chapter and verse' of constitutional law, . . . , but '[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated.'" *Blackmon v. Booker*, 394 F.3d 399, 401 (6th Cir. 2004) (quoting *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) and *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000)) (holding claim was not fairly presented where petitioner's only citation to federal authority appeared in a section heading and petitioner "failed to develop any cogent arguments regarding those rights beyond the naked assertion that they were violated."). *See also Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (finding claim of "denial of due process and a fair trial" in violation of "14th and 6th Amendments" without citation to federal constitutional cases insufficient for fair presentation).

Aside from a few references to "Fair Trial," "Due Process," and "Equal Protection," (Doc. No. 13-1, Exh. 17 at 242), Peterson did not couch the legal arguments he made in his jurisdictional memorandum to the Ohio Supreme Court in constitutional terms. Nor did he cite to any provision of the Constitution or any federal or state-court case applying federal constitutional law to support them. On the other hand, again liberally construing his state-court pleading, Peterson did present factual arguments that would advance a federal sufficiency-of -the-evidence claim, such as alleging a lack of physical evidence linking him to the crimes. The Court finds, therefore, that Peterson fairly presented this claim to Ohio courts, and it is preserved for federal habeas review.

## 2.    Merits

The state appellate court, upon reviewing this claim, reasoned:

{¶ 71} Peterson claims that the state failed to provide sufficient evidence to support his convictions. He also argues that his convictions were against the manifest weight of the evidence.

{¶ 72} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). . . .

{¶ 74} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013 Ohio 1184, ¶ 18.

{¶ 75} In Case No. CR 13 571165, Peterson was convicted of aggravated murder in violation of R.C. 2903.01(B) in Count 8 (Jacobs) and Count 26/19 (Stewart) and murder in violation of R.C. 2903.02(B) in Counts 10 and 11 (Jacobs) and Counts 28 and 29 (Stewart). Also in Case No. CR 13 571165, he was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1) and (3) in Count 13 (Kanaan) and Counts 30 and 31 (Stewart). Peterson was also convicted of aggravated robbery in Case No. CR 13 571726 in Count 1 (Widdi) and Count 2 (Gibson).

{¶ 76} In Case No. CR 13 571165, Peterson was convicted of felonious assault, in violation of R.C. 2903.11(A)(1) and (2) in Count 17 (Kanaan) and Counts 32 and 33 (Stewart). He was also convicted of kidnapping in violation of R.C. 2905.01(A)(2) in Count 15 (Kanaan) in Case No. CR 13 571165 and in Count 3 (Widdi) and Count 4 (Gibson) in Case No. CR 13 571726.

{¶ 77} Finally, in Case No. CR 13 571726, Peterson was convicted of theft in violation of R.C. 2913.02(A)(1) in Count 5 (Widdi) and having weapons while under disability in violation of R.C. 2923.13(A)(2) in Count 8.

{¶ 78} R.C. 2903.01(B), aggravated murder, provides that

> [n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

{¶ 79} A person acts purposely when it is his "specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Purpose," therefore, depends on an intended result. . . .

{¶ 80} Circumstantial evidence can be used to demonstrate purpose or intent. . . . Intent may therefore be ascertained from the surrounding facts and circumstances in the case:

> "[The] surrounding facts and circumstances include the nature of the instrument used, its tendency to end life if designed for that purpose, and the manner in which any wounds were inflicted. A jury can infer intent to kill by the defendant's use of a firearm, an inherently dangerous instrumentality, the use of which is likely to produce death."

. . .

{¶ 81} Under R.C. 2903.02(B), felony murder, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]"

{¶ 82} R.C. 2911.01, aggravated robbery, states that

> (A) [n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall:

(1) [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(3) [i]nflict, or attempt to inflict, serious physical harm on another.

{¶ 83} Under R.C. 2903.11(A), felonious assault, "[n]o person shall knowingly * * * (1)[c]ause serious physical harm to another * * *, or (2) [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 84} R.C. 2905.01(A)(2), kidnapping, provides that "[n]o person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o facilitate the commission of any felony or flight thereafter."

{¶ 85} Under R.C. 2913.02(A)(1), theft, "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent."

{¶ 86} Finally, R.C. 2923.13(A)(2), having weapons while under disability, provides as follows:

Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

{¶ 87} Ohio's complicity statute provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). Under R.C. 2923.03(F), a person who is guilty of complicity in the commission of an offense "shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated * * * in terms of the principal offense."

{¶ 88} As previously stated by this court in *State v. Langford*, 8th Dist. Cuyahoga No. 83301, 2004 Ohio 3733, ¶ 20, 21:

In order to constitute aiding and abetting, the accused must have taken some role in causing the commission of the offense. . . . "The mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." . . . * * * A person aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. . . . "Such intent may be inferred from the circumstances surrounding the crime." . . .

Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. . . . Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout. . . .

{¶ 89} An unarmed accomplice can be convicted of an underlying felony, along with a firearm specification, based on an aider and abettor status. . . . The same principle applies to a conviction for having weapons while under disability in violation of R.C. 2923.13(A)(2). . . .

{¶ 90} Upon our review, we find that there was ample evidence to support Peterson's convictions. The testimony and the evidence clearly established that Peterson was complicit in a crime spree that involved aggravated murder, aggravated robbery, kidnaping, felonious assault, guns, and theft.

{¶ 91} The evidence established that the group of men would "scope [each] place out" for purposes of committing a robbery, and each accomplice had his own role in the crime. Regarding the crimes committed at the Gas USA and the Ya Ya Market, the evidence showed that Mongo distracted the store's clerk, Coleman pulled the gun on the clerk, and Peterson drove the getaway car. Several witnesses identified Peterson's gold Explorer outside the Ya Ya Market, which was the only vehicle Peterson was known to have driven and was the only vehicle at the scene of the crime. The evidence also clearly shows that guns were used to facilitate each crime, the victim died from a gunshot wound, and Peterson received a portion of the money obtained from the crime.

{¶ 92} Peterson also argues that there was insufficient evidence to support a conviction for having weapons while under disability in Case No. CR 13 571726 because the verdict form indicated that Peterson had a prior conviction for possession of cocaine from Cuyahoga County and "there was no evidence presented or stipulated to at trial that would support the conclusion that [Peterson] had a prior conviction *

* * in Cuyahoga county." We note, however, that the record reflects that Peterson has a prior conviction for drug possession in Lake county and the jury was instructed accordingly. The jury instructions correctly identified Peterson's prior conviction "in the court of common pleas, Lake county, Ohio case no. 09CR000100" for "the crime of possession of cocaine, in violation of R.C. 2925.11 of the state of Ohio." Moreover, counsel has stipulated to the prior conviction. The clerical error contained on the verdict form does not support Peterson's argument that there was insufficient evidence of a prior conviction.

{¶ 93} Regarding the crimes committed at the Union Beverage, the evidence established that the men were planning to rob someone that evening, and once inside the store, Peterson had identified a potential target with a lot of cash. The evidence also shows that Peterson shot the victim while instructing an accomplice to go through the victim's pockets, the victim died from a .45 caliber gunshot, and Peterson possessed a .45 caliber handgun.

{¶ 94} Peterson claims that the only evidence of his involvement in the crimes "comes from self-serving testimony of the co-defendants and their loved ones; all who have reasons to lie." The credibility of the witnesses, however, is an issue primarily for the trier of the facts, and a jury is free to believe all, some, or none of the testimony of each witness appearing at trial. And, in fact, the jury was instructed to evaluate the testimony of the accomplices "and to determine its quality and worth or its lack of quality and worth."

{¶ 95} In viewing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. We therefore find sufficient evidence to support Peterson's convictions. We further find that after reviewing the entire record, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. Therefore, Peterson's convictions are not against the manifest weight of the evidence.

*Peterson*, 2015 WL 1249680, at *13-18 (certain citations omitted).

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315  16 (1979). A federal habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis original). "[T]he

*Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). In reviewing sufficiency claims, federal habeas courts "do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [their] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Because both *Jackson* and AEDPA apply to Peterson's sufficiency claim, federal habeas review requires deference at two levels. "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by [the] AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010). The circuit court has observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis,* 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Peterson has not met this burden. He makes the same arguments here as he made in the state appellate court. As to the Gas USA and Ya-Ya Market incidents, he argues there was no

physical evidence linking him to the crimes, and none of the witnesses testified to seeing Peterson at the scene of the crimes. (Doc. No. 14 at 43-44.) Peterson also challenges the co-defendants' testimony. He points to Mongo's testimony: (1) that before the Ya-Ya Market robbery, there was "really, no conversation" between the co-defendants, and then that there was a conversation but it was between him and Coleman with Peterson just listening, and after the robbery Peterson again did not say anything; and (2) asking defense counsel, "Do you want me to say you shot him? I say you shot him." (Doc. No. 14 at 43-44 (quoting Doc. No. 13-4 at 51-52, 57-58, 158-59).) Finally, Peterson notes that several witnesses contradicted the State's position that he drove his car, a gold SUV, as the getaway car. (Doc. No. 14 at 44.) He points to the USA Gas victim's testimony that he saw the suspects get into a maroon car (*see, e.g.*, Doc. No. 13-3 at 245), and several Ya-Ya Market witnesses' testimony that the suspects used a silver car (*see, e.g.*, Doc. No. 13-3 at 129-30, 170; Doc. No. 13-8 at 175). (Doc. No. 14 at 44.)

As to the Union Beverage incident, Peterson contends that although he was at the store that night, he was not seen committing any crimes on the video surveillance. (Doc. No. 14 at 44.) He also claims no weapon was recovered "from his possession or his residence." (Doc. No. 14 at 44.) And he asserts the testimony of Fizell, whom he claims was the only "disinterested witness," exonerated him. (Doc. No. 14 at 44-45.)

Peterson further argues there was insufficient evidence to support his conviction for felony murder, because there was insufficient evidence that he committed or even participated in the commission of the predicate offenses of felonious assault or aggravated robbery. (Doc. No. 14 at 45.) He contends "[t]he only evidence of Peterson's alleged involvement comes from self-serving testimony of the co-defendants and their loved ones; all who have reason to lie, and one

who admitted that he would lie if it meant he would get off easy." (Doc. No. 14 at 45.) Peterson also challenges the evidence supporting his weapon-under-disability conviction, because the State did not prove theft of a specific amount of money or items, and the verdict form allegedly stated he had a prior conviction for possession of cocaine in Cuyahoga County, which was not proven at trial. (Doc. No. 14 at 45.)

But Peterson does not contend that the state appellate court incorrectly stated the law governing federal constitutional sufficiency claims, and it did not. *See State v. Jenks*, 61 Ohio St. 3d 259 (1991), paragraph two of the syllabus (expressly following *Jackson*). Nor does he contend the state court's factual findings are clearly erroneous under § 2254(e)(1), or its factual determination is unreasonable under § 2254(d)(2). Peterson does not even argue that the court contravened or misapplied *Jackson* under § 2254(d)(1) in rejecting the identical arguments he raises here.

Indeed, the Court has reviewed the record and finds the state appellate court's decision denying Peterson's sufficiency claim was reasonable. The state court found "ample evidence" to support the jury's finding that Peterson was an accomplice in the "crime spree" described by the State. *Peterson*, 2015 WL 1249680, at *17. It addressed Peterson's argument regarding the conflicting evidence about the getaway car's color, noting "[s]everal witnesses identified Peterson's gold Explorer outside the Ya-Ya Market, which was the only vehicle Peterson was known to have driven and was the only vehicle at the scene of the crime." *Id.* It also rejected Peterson's claim regarding the incorrect verdict form, *see id.*, which Peterson does not contest here. As to the lack of physical evidence linking him to the crimes, the state court noted that the Union Beverage victim died from a .45 caliber gunshot, and Peterson possessed a .45 caliber

handgun.  *Id*.  Finally, as the state court observed, the credibility of witnesses is an issue for the jury to determine.  *Id*.  The jury chose to believe Peterson's co-defendants and family members, and this Court will not revisit that issue or substitute its judgment for that of the jury.  *Brown*, 567 F.3d at 205.

The Court finds, therefore, that after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes for which Peterson was convicted beyond a reasonable doubt.  *Jackson,* 443 U.S. at 319.  Peterson has not demonstrated that the state appellate court's decision is based on an unreasonable determination of the facts or contravenes or unreasonably applies *Jackson,* and the Court recommends that Peterson's second ground for relief be dismissed.

### CONCLUSION AND RECOMMENDATION

For the reasons stated above, the Court recommends that Petitioner Damon Peterson's petition for writ of habeas corpus (Doc. No. 1) be DISMISSED in its entirety, because the claims raised are procedurally defaulted, non-cognizable, and/or meritless.


Date:  December 7, 2017                  *s/ Jonathan Greenberg*
                                          Jonathan D. Greenberg
                                          United States Magistrate Judge


### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**